May it please the court, your honor. I represent Leon Farley. Leon Farley was convicted of assault with a dangerous weapon assault resulting in serious bodily injury and sentenced to five years in restitution in this case. I'd like to talk about three issues today. The first issue is the denial of the motion for acquittal on the grounds of self-defense. I'd also like to talk about the instructions that were given or that were not given. And I would like to talk about the exception, Leon exception to the search warrant requirement in this case. In talking about the first issue and that is whether or not the motion for acquittal should have been granted, I think I can, I'd like to combine that with just some of the facts of this case because I think that the facts as they happened on that day justified or should have justified a motion for acquittal. Are you saying that no reasonable jury could find that he did not act in self-defense? Is that the basis? That is, your honor. It's not even a jury question. Under the facts of this case, I really do not think it's a jury question. Okay. Well, go ahead. Tell us why you think so. I think, first of all, Leon Farley and Leslie Oki on that morning went to Standing Rock to the casino up there. They had been going together since September of 2011. They were, they went up there and then they got back about 10.30 that day. I think it's important to understand that Leon Farley did not know Merton Eaton. He'd never talked to him. He'd never, never had any communication with him. And the government in this case tries to set up a scenario where Leon Farley somehow had set up a Merton Eaton to be in the trailer that night. Well, as a matter of fact, the evidence is, the evidence showed that Merton, Leon Farley had never met or talked to Eaton. He did not know he was in the house that night. He didn't know who it was until he was, until the fight was over. Leon Farley, when, Leon Farley had been with Leslie Oki that entire day. Wasn't there some testimony that perhaps he, Mr. Farley, did say something that indicated he identified Mr. Eaton before the fight started? There was, that was the allegation of the government that he had called him like a pervert or something in there while he was in the house. But Leon Farley indicated when he testified, and the important part of this is, Your Honors, Eaton did not, Merton Eaton did not remember anything that occurred in that trailer that night after he entered it for the second time. He entered the trailer for the second time, and that's when he locked the doors and waited for them to come home. What about the kicking of Eaton in the head with the boots? If the jury believed that, why isn't that enough to be held accountable? That is a, I mean, that is a weak, weak argument, Your Honor, because of the fact that Leslie Eaton, that's, they have evidence that Leslie Eaton said that at the grand jury, but she did not say that. She said she, he, most of the . . . Well, did it come in? Did it come in for the truth of the matter as prior testimony? Yeah, yeah, I think it did. All right. Well, then why couldn't the jury accept it? Because even if the jury believed her, this was, this was a one-kick deal as the fight was entirely over that night. As they were leaving, that's what Leslie Oakey said, that he kicked at her. There was no, there was no testimony from any medical doctors that this could have come from any kick to the, his injuries could have come from any kick to the head. What about the blood on the boot? The blood in the boot. There was a one, that, as we know, Leon Farley broke open the door to get in the house after this lady was screaming for him. And . . . But, I mean . . . In doing that . . . Wasn't Eaton's blood on Farley's boot? There was one speck of Eaton's blood on the sole of the toe of one boot. And if you just take a look at those boots, you will see that those were the most used boots you've ever seen. There could hardly have been any kind of assaultive behavior with those particular boots. And there was no showing that there was any contact. And we know that that trailer was almost covered with blood, primarily because of Farley's blood. Because when he reached in to break open the door so he could go in and help Leslie Oakey, he cut his arm, requiring 32 stitches, and consequently there was blood from one end of the trailer to the other. Now, if you just presume that this man broke into this house, which he did, on two occasions, Eaton had loaned Leslie Oakey his car, saying that he would come back after it on April 1st. This was not April 1st. This was March 31st, the day before that. So, Eaton comes to Eagle Butte and starts looking for her, and looking for the keys to the car. He spends all day practically going around to different people who he thought would know where she was at. He first went into the house, which constitutes a burglary, there's no question about it, looking for his keys, ransacked through the house, left, and then about three hours later at nine o'clock at night, come back and told the person that gave him a ride there that he should go home and he was going to stay there. So he goes in her trailer and locks himself in the trailer and locks the doors. Then Oakey and Farley come home. They know that the door was locked because she said she usually locked the door. She goes in the back room, in the window. He helps her in. She goes in there. It's dark out. This is a dangerous part of town. Did she not have her keys? She didn't have her keys, no. Wasn't there testimony that she left it open? There may have been some testimony as to that, that she left it open. But that wouldn't have justified him walking in her house and not only once but twice being in the house, locking himself in, turning off the lights. What's any of this have to do with whether there should have been a judgment of acquittal on self-defense? I think... I mean, what was Farley defending himself against? Farley was defending himself because when he went into the house, after he broke the glass off of the trailer house door, reached in, hurting him, he goes in there and he's attacked by Eaton. I mean, this is a person that has a right to be there in this house. What was the testimony regarding the attack? What testimony or evidence was presented as to what Eaton did to Farley first? Okay. They went in the house. The first evidence is what happened between Oki and Eaton. Eaton, she goes in, she's confronted by Eaton. She tells him to leave, to get out. She's startled. And Eaton says, no, I'm not going to. I'll deal with Farley. He knows she's with Farley. Farley then, at that particular time, hears yelling inside of the trailer, hears something bumping the mobile home door, or wall, goes in and he's attacked by Leon Farley. He's attacked by Merton Eaton. Leon Farley is the only person, other than Leslie Oki, who testified. Eaton did not rebut this. He did agree that he was in the house unlawfully. There's no question, but there was a mutual fight there between Eaton and Farley in this particular case. When you look at it like that, I believe that no reasonable juror could have found that Leon Farley was not acting in self-defense on this night. There was also a knife that was found there during this second investigation. There was no DNA or any evidence done on that knife, so there may have been a knife involved. I think clearly, this was a classic case of self-defense. I submitted . . . I'd like to go on to the instructions in this case. I submitted an instruction on defense of your home in this case. I don't know if the Eighth Circuit has ever addressed that issue. I don't think that the Eighth Circuit has ever said that it couldn't be given, but I believe that the instructions one and two that I proposed in this case clearly sets forth the law by the common law and the law under the state of South Dakota that if someone's in your house and intent on committing a felony upon someone who has a right to be there or by one who illegally trespasses, you can use force to resist the commission of the felony to prevent the trespass. That was submitted. It was not given. I submitted a request for an instruction on the fact that you're not required to retreat, which this court has approved in this pattern during instructions. I also submitted an instruction on the fact that the person who is in the house is not required to have a weapon. An aggressor is not required to be armed. Those are standard jury instructions that I submitted that were not given in this case. The government really does not address that issue in its brief. I think it's clear that that is a proper instruction, that that is reflective of the common law, federal common law. The Indian country statute does not prevent that from being given. I think that the Assimilated Crimes Act would justify giving that instruction because there is not any federal statute on that particular issue. Which issue are you talking about? The issue of the instructions on protection of your home. Well, it wasn't his home. It wasn't his home, but he had a right to be there. Under the common law, if you have a right to be there, you have a right to protect that home. What's your best authority for that? The South Dakota statute doesn't put it in terms of the right to be there. First of all, it doesn't make any sense for one who has a right to be in a home, who's accosted by someone, to say, oh my, I can't protect this home, so I better not defend myself. I don't think that's a logical exception to the right to defend your home. You're saying any house guest has a right to use force. Under the facts of this case, I think that if two people come home who own the home. He doesn't own the home. She did. She was home. I know, she owned the home, but you're saying Farley owned the home. Well, one of the persons owned the home. They both had the right to be there. Farley actually lived there for a while. He had another home, but his clothes were there and he lived there. I think that he had the right to defend and would have a right to that jury instruction in this particular case. Wasn't the uncontroverted evidence in the case that the appellant had broken into the home, had forced his way into the home? Being in that position, even under South Dakota law and the statute that you've been talking about, I fail to see how that would avail the appellant. Your Honor, he broke into the house because he heard her yelling and screaming. In order to get in there, he broke the window of the trailer house, reached in and opened the door and went in there and was confronted by Leon Farley. He's not going in there for any illegal purpose. He was going in there to protect the home. Did the appellant testify? Yes, he did. Wasn't the testimony of Ms. Oakey that she didn't want to allow him in the home? She was fearful that he was angry, that she was fearful of what would happen if he entered the home? The government led Leslie Oakey in this case. It was mostly the testimony of Mr. Hanson. She said that she tried to get him to leave the house through the back door, but he would not do that. He pushed her out of the way so that he could not go out the back door. That's not responsive to Judge Shepard's question. The question was, did Oakey testify that she did not want Farley to enter the home because she was afraid of a confrontation? She did not testify that she did not want Farley to, it was the intent, Your Honor, that she go in the window, get into the trailer and unlock the door so that Farley could come in. He was standing by the door waiting for her to go through the window, come back, open the door. So you're saying that Oakey did not testify that she did not want to open the front door because she was afraid of what would happen if Farley came in? I don't believe she did testify to that, Your Honor. On this defense of property, what facts or other than the fact that Mr. Eaton was there at the home justified giving an instruction like that if we assume that it's a proper instruction? What was at risk within the property of the home? What was at risk? She was in there. There was a confrontation between her and Eaton. He didn't know what Eaton was going to do. He didn't even know it was Eaton in there at the time. I mean, I think it's just classic defense of property. Excuse me. Go ahead. Do you want to save any time for rebuttal? I just want to talk about the exception to the search warrant in this case. Okay. It's up to you whether you want to save. I need to talk about that. All right. Go ahead. The search warrant was declared to be insufficient by Judge Lang. The government didn't appeal that, but he did rule that it was admissible under the good faith exception. If you look at the affidavit in this case and you look at the exceptions that I cited in my brief to the application of the Leon good faith exception, you'll see that that affidavit was wholly insufficient. The good faith exception was intended to pertain to technical defects. This defect was, as I set forth in my brief, erroneous for a number of reasons. Clearly, the admission of those boots and the saliva, the DNA that was done in the saliva, was not justified by any good faith exception in this case. Thank you, Your Honor. Thank you. Mr. Hanson, we'll hear from you. Thank you. May it please the court, counsel. Good morning. My name is Mike Hanson. I'm an assistant United States attorney, and I was the trial attorney in this case. It's an assault with a dangerous weapon, an assault resulting in serious bodily injury case. There's really three key players. There's Leon Farley, who's 39. He and his family own a ranch. There's Leslie Oki, who had been his girlfriend but testified that the two weeks before this, they had broken up and they were no longer together. She also indicated that they weren't an item, but during the second day of trial, the two met at the bowling alley and pier where the trial was, talked for two or three hours, drank, and went home that night to a motel room together and slept together. So Leslie Oki clearly was still in love or had a relationship with the defendant. And the other person involved in this is Merton Eaton. He's 62. He was about 250 and about 5'4", 5'6", in that range. This is a case where it was serious enough that we filed a complaint right away instead of waiting for the grand jury to sit, and then when the next grand jury happened, in hindsight, I'm very happy we brought Leslie Oki to the grand jury, and she gave sworn testimony in front of the grand jury. Now, her testimony at trial changed, or at least her attitude changed. She was very hesitant to talk about what happened at the trial, and we would often have to remind her, didn't you say to the grand jury? And then she would agree. She would look at the grand jury testimony and then make the admission, yeah, that's what she said. So even the trial judge talks on the record a couple of different times about how reluctant Leslie Oki is, and it might not show up on the record because you kind of had to be there to see her hesitation or body language, that type of stuff, but he commented in regard to that. There are a couple of facts that I quickly wanted to turn to. The defense counsel again mentioned a knife. There were pictures taken the night that this happened of the area, of the floor, and there's no knife there. Pictures were taken, and it was searched three days later, and then there was a knife found in that back bedroom, but clearly even Mr. Pechota recognizes that there is no evidence, and even the defendant didn't claim that there was a knife involved by Mr. Eaton. There's been conflicting testimony in regard to this case. The defendant has made the argument to the jury and to you on appeal that 62-year-old Merton Eaton is a stalker, a burglar, a dirty old man, and an aggressor in the fight. The evidence just does not support those theories. If we go to the actual testimony right relating to the entry, Leslie Oakey said, I was startled by seeing Merton Eaton, but I knew him. He was a friend of mine. I was not afraid of him. She says, I don't recall screaming, and I'm not a screamer. I don't scream. Only Farley made the claim that she screams. The lights are on both in the kitchen and in her bedroom, and it's a tiny, tiny trailer, so the lighting is all there. She clearly recognized who it is, and she says she is afraid. She's afraid that Merton's in there, a friend of hers, and she has her sometimes jealous boyfriend at the front door knocking to get in. She's telling 62-year-old Merton Eaton, you've got to get out of here. You've got to leave. You've got to crawl out of this tiny little window in the back bedroom on the other side of the trailer. Merton Eaton says, I'm not crawling out a window. I'll just tell Leon Farley that I'm here to get my car keys, and there's no question. That was what he was there for, to get his car keys. I'll just tell him that, and they're having this discussion in the bedroom that would be on the west side, opposite from her bedroom. She's gotten him all the way over kind of where the back door is. That's where all the blood first is. The first group of blood is there. So when Farley breaks in, he has to go from the front door to where Merton is. She says that Merton says, the first thing Farley said is pervert. What in the world are you doing here, and how did you get in here, you pervert? So is there any evidence in the record of any actions on the part of Eaton first? Again, remember how reluctant Leslie is. Leslie says that Farley comes to him. Farley comes to them. Merton, she's grabbing hold of him, trying to get him out to go out the back door. He kind of pushes her aside, and he says, I'm here to get my car keys. And then her testimony is, I don't know who started the fight. I don't know how the physical fight started. What did Farley say? Farley says, yeah, that he came at me. I'm by the front door. Stay by the microphone, please. He says, I come charging. So the answer is, yes, there is evidence that Eaton instigated the fight. Farley's testimony. By Farley's testimony, yes. But not by the eyewitness. He's the eyewitness. She just says she doesn't know. Correct. But the fight. There's nobody who says Farley instituted it. Right. Right? Right. But certainly the implication is, because he's the one angry. He's the one that breaks in. The blood is over where the two are when she's trying to get him out of the house, not where Farley enters the house. And so, yeah, I mean, the argument we made was the logic, the facts of this case are logical. He's jealous. And to say he doesn't know this, these are small towns. This is Eagle Butte, South Dakota, and the neighboring community of Dupree. Farley's friends, the evidence, the jury heard this. Farley's friends have told him, Merton's over there bragging about how your girlfriend had sex with him for money. Farley hears who Merton Eaton is. He knows who Merton Eaton is. And Merton Eaton also goes to Farley, the mother of his children, and has a contact with her. He clearly knows who Merton Eaton is. The lights are on in there. And the evidence that he calls him a pervert, he doesn't say, Who are you? What are you doing here? If it was a street person, if it was a burglar, who is it? He says, You pervert, what are you doing here? So that's clearly evidence that he knows who the person is. All through that night, Farley is violent, aggressive, confrontational. He's confrontational in the ride with Bud Lone Eagle. Bud Lone Eagle says he's fighting with Leslie, pushing her out of the car. He's violent at Alvina's, the aunt's residence afterwards. He's assaulting Leslie in the bathroom to the point where Alvina, her aunt, calls the police. He's assaulted with the police officer when they go to the hospital, to the point where the hospital tells the police officer, Get him out of here. We're not going to treat him. When he comes back after settling down, he becomes aggressive to the point where the doctor who's going to treat him says, I thought about I was going to have to sedate him. I'm going to have to sew up that arm. I'm going to have to give him a general anesthetic. So he's violent, aggressive, and confrontational that whole time. The other keys is when I did ask Leslie Oakey, and it's two different times in the trial, I asked Leslie Oakey, I said, When Farley is knocking on your front door, you know, wanting to get in, why didn't you go over to the door and unlock it? And she says, I didn't want him to come in, because I didn't want him to do. And then she kind of stopped. What he did, what he actually did, severely beat Mertini? She said, Yes. And she says that in two different times is the reason that she did not want Farley in her trailer was she knew there would be a confrontation. And this is the person who knows these two people the best. And the person that she's worried about is Farley, not Mertini. She says, I was not afraid of him. So those are sort of the facts. The other thing I would say, if you have a known intruder, you take his story to be true. He thinks it's a burglar. He thinks it's an intruder. Well, after you've rendered him disabled, and look at Exhibit 13, and I bring that because it will show the kick blood spatters that show where the blood is. After you've rendered him disabled, you call the police. You call them and say, We had an intruder that entered our house. He doesn't call. He does not initiate a call to the police. But an hour later, he does have contact with the police because Leslie's aunt wants him out of her house. He doesn't tell them about the intruder that was in Leslie's trailer. And when asked about how he got the cut on his arm, he doesn't say, I got that breaking in to fight or take care of an intruder.  To the police he says the fence is right by Alvina's. At the hospital he says the barbed wire fence is out at his ranch. So those facts certainly don't fit with his claim now or his claim to the jury. I'd be interested in what you have to say about the instructions. There were three requested, as I understand it, defense of property, no duty to retreat, and no need to show that the intruder was armed. And your brief talks about property in a page or two and doesn't mention the other two. I'll come to that. I looked at that too last night. Let's just start with that. In regard to the instruction about there's no duty to retreat and self-defense is available even if the person injured is unarmed, this court has dealt exactly with that issue in United States v. Walker. And it's found at 817 Fed Second 461. And in that case the district court gave an instruction almost exactly like our self-defense instruction. And this court said that that was sufficient. It told the jury sufficiently about it. It gave him the opportunity to make those arguments to the jury. And it is exactly on point with the two instructions that he talked about. You know, those were kind of intertwined. In the proposed instructions, those no duty to retreat and the self-defense even if it's unarmed, they're kind of intertwined with this protection of property instruction. They weren't offered individually. Now the district court could have cut and pasted, but they kind of got caught up with the whole thing. Why do you think defensive property should not be recognized under the federal common law? First off, as Judge Lang said, the facts don't fit here. As pointed out, this isn't his property. He did not live there. He lived in LaPlante several miles away. Mr. Pechota said that he used to live there. Well, there's no evidence in our record that he used to live there even. But the more basic point is the owner of the house did not want him in there. He's really the only one who broke in, who broke something to get in. So factually he does not have the right of defensive property. Secondly, in regard to federal law. Hold on a second on that. Did he say that he was invited in by Oki? He claimed she was yelling and she was yelling help. I see. So he claims he went in to help. But he does not say he yelled, come in, come in, come in. Well, if you believe his story, then, did he have a right to be in there to assist her? Well, again, a person very much associated with him told the jury she did not want him in there. I understand that. But that's a jury question as to which version is true. So don't the instructions have to be given based on any scintilla of evidence that would allow it? I don't know if it's a scintilla. It's one witness's version that you say is not credible. You don't think that's enough to get an instruction if the jury believed? Well, even he, if I recall his testimony, even he didn't say she said come in. I mean, she yelled and screamed, and I do remember that he said she yelled for help. Yeah. But she doesn't say come in or please come in. Even if he had a right to be in there, is that enough to get an instruction under this defense? We have, you know, this court has seen assault, serious assault statutes off the Indian reservations for years and years and years, and I looked through all those cases, and the instruction given on self-defense, in this case, is what is always recognized. I mean, it is the standard instruction on self-defense. It is on defense of the person, but I think that statute in South Dakota says if it's your home at least and someone is a trespasser and won't leave, you have the right to use force to remove him. But this is a federal statute. I know. So the question is what's the federal common law? And federal common law does not recognize protection of property. Well, what's the authority for that? Well, there's no federal case. The only federal case we could find showed that the defendant asked for such an instruction, but the court of appeals in a per curiam opinion said no. It was proper for the district court not to give that instruction because there is no recognized defense of property. And if you talk about the evil protection argument that he brings up.  It is. Yeah, all right. It's in the footnote where we say it's cited by the defendant, but it's not for that proposition. It's about the mailman or a postal inspector that gets attacked on a person's property. Now, it also says that the postal inspector had the right to be there, but it also says that the defendant's proposed instruction of defense of property was denied by the district court and that was proper. An equal protection argument he makes, we often charge non-Indians with the federal assault statutes under 1152, the Assimilated Crimes Act. A non-Indian would be charged with the same offense. He would get the same instruction. He would get the same self-defense instruction in regard to this case. The claim that a non-Indian would get the benefit of South Dakota law is completely untrue. That's not true. You'd have to be in a South Dakota court to get the South Dakota instruction that he proposed in this case. No person in federal court, Indian or non-Indian, gets that defense of property instruction, nor is it recognized in any case that I could find federally. Finally, the Lee on good faith argument, Your Honor. As the district court points out in his well-written opinion, unfortunately this case started with a detective called Detective Russell Lee. There's two detectives at Cheyenne River employed by the Cheyenne River Sioux Tribe. He began the investigation. He talked to Leslie Oakey that night. She was very cooperative. At that time, immediately following what had happened. But then the day or two after that, he had to go to training in Pierce, South Dakota. Now, he recognized that he wanted to get physical evidence, the blood that was at the house. He wanted to get Farley's boots and a DNA sample. So he called and talked to his fellow detective, Larry Lebow, who put together the affidavit. Now, that transfer of information was certainly not the best. But even our federal magistrate said that the affidavit had probable cause in his recommendation and report. So even a federal magistrate looked at it and said it was marginal. It's very marginal, but I recognize that there's probable cause here. There's nothing really to link it to Mr. Farley, is there? But if we think about a tribal detective in rural South Dakota, the requirement is that he's supposed to know from looking at it that it is not sufficient. And my argument is if a federal magistrate said that that's sufficient, you know, it's not beyond the realm of possibility to say that a detective, a reasonable tribal detective, would think it was also. Is that the standard? We certainly had training with them after this case in regard to preparing affidavits, but . . . Okay. Well, unless Judge Kelly has anything else on this. Thank you, Mr. Hanson. I appreciate it. Thank you, Your Honor. Mr. Picotta, I think you have 25 seconds left if you have any brief comment. Your Honor, I would just say that on that case that he talks about on the . . . Please approach. . . . that's a common law. That case, it did indicate that it would not give that instruction, but the reason that it refused to give it was because the facts didn't justify it. It doesn't really say one way or the other, does it? Well, implicitly, I think you could argue that it implicitly endorses the fact that there is a federal common law . . . All right. We'll look at it. Thank you very much. The case is submitted and the court will file an opinion in due course. Please call the . . .